**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **KEITH E. WASHINGTON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case number 4:12cv2208 TCM** |
| ) | |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W.

Colvin, the Acting Commissioner of Social Security (Commissioner), denying the

applications of Keith Washington (Plaintiff) for disability insurance benefits (DIB) under

Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental

security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the

undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C.

§ 636(c).

## Procedural History

Plaintiff applied for DIB and SSI in June 2010, alleging he was disabled as of April

14, 2009, because of asthma and pain in his lower back, right shoulder, and left leg. (R.[1] at

157-67, 205.)  His applications were denied initially and after a hearing held in August 2011

before Administrative Law Judge (ALJ) Robert E. Ritter.  (Id. at 7-19, 24-80, 94-102.)  After

---

[1]References to "R." are to the administrative record filed by the Acting Commissioner with
her answer.

considering additional evidence, the Appeals Council denied Plaintiff's request for review, thereby effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-6.)

## Testimony Before the ALJ

Plaintiff, represented by counsel; Morris Alex, M.D.; and James Israel, L.P.C., C.V.E.,and C.R.C., testified at the administrative hearing.

Plaintiff testified that he was then 45 years old, 5 feet 11 inches tall, and weighs 285 pounds. (Id. at 29.) He lives in a house with his four children, who range in age from five years old to thirteen. (Id. at 29-30.) He is not married. (Id. at 30.) Plaintiff attended two yeas of community college. (Id. at 31.)

Plaintiff explained that he has continuous problems with his right shoulder when lifting things or doing activities. (Id. at 34-35, 36.) He injured the shoulder playing football in college. (Id. at 34.) The pain is a aching, throbbing, sharp pain. (Id. at 35.) His doctor has told him to reduce his activities and has prescribed a pain medication. (Id. at 36.) His lower back also hurts. (Id.) He cannot bend over, cut the grass, or wash dishes. (Id. at 37.) The pain is severe and causes him to have to sit down at times. (Id.) It also hurts when he is going up and down stairs. (Id.) It "throbs a little bit" when he is seated. (Id.) Pain medication helps "[s]omewhat." (Id. at 38.) Because of his back pain, Plaintiff cannot vacuum or sweep. (Id.)

Plaintiff also has severe, aching pain in his left knee. (Id.) The pain is worse when he climbs up and down his basement steps and when he drives a car. (Id.) Also, the knee

starts hurting if he sits or stands for too long.  (Id. at 39.)  He cannot stand for longer than three minutes.  (Id.)  He cannot carry groceries heavier than ten pounds.  (Id.)  His doctor has told him he has severe arthritis.  (Id. at 40.)

Plaintiff has problems with his neck due to being in several accidents.  (Id.)

Plaintiff began seeing his current doctor, Dr. Poetz, in November after being approved for Medicaid.  (Id.)  He is being seen at Hopewell Center for depression and has been prescribed Cymbalta.  (Id. at 41.)  It causes him to be sleepy.  (Id.)  Because of his depression, he withdraws from people.  (Id. at 42.)  Approximately twice a week, he has suicidal thoughts.  (Id.)  Because of the stress he is under, Plaintiff hears or sees things at night.  (Id. at 54.)  He hears voices telling him to do such things as cut his wrists.  (Id.)  He has been seeing a psychiatrist for the past two months.  (Id. at 61.)

Plaintiff only gets three to four hours of sleep a night.  (Id. at 43.)  He has been given medication for the problem.  (Id.)

Plaintiff cannot concentrate for longer than thirty minutes at a time.  (Id. at 44.)  He forgets things and is frequently tired.  (Id.)

His mother and a female friend help him care for his children.  (Id.)  And, his children have household chores.  (Id.)  He gets his children ready for school in the morning.  (Id. at 45.)  During the day, he watches television and tries to read.  (Id.)  He goes to restaurants with his female friend once a month and goes dancing or something similar.  (Id. at 46.)  He has been using a cane for the past three weeks to help with stability.  (Id.)

On a scale from one to ten, Plaintiff's average pain level is a nine or ten with medication. (Id. at 46, 48.) The pain is a five when he is lying down. (Id. at 49.) His doctor has told him to lose weight, and he has been trying to do so. (Id. at 47.) His doctor has also limited the amount of weight he should lift to fifteen to twenty pounds. (Id. at 56.) He has not limited the amount of time he should walk or stand. (Id.) Plaintiff limits himself in these activities due to pain. (Id.)

Plaintiff explained that he cannot even work at a job that does not require lifting because of his back and shoulder pain. (Id. at 58.)

Plaintiff's medications include Divalproex (an antidepressant), Cymbalta (an antidepressant), Tylenol 3 (acetaminophen and codeine), Seroquel (an antipsychotic medicine), Arthrotec (a nonsteroidal anti-inflammatory drug), and tramadol (a pain reliever). (Id. at 60.)

Dr. Alex testified that, based on his review of certain exhibits, he could offer a "medically certain diagnosis" of obesity (he opined that Plaintiff is a hundred pounds overweight) and mild osteoarthritis in his lumbar and cervical spines. (Id. at 62-63.) None of Plaintiff's problems are of listing-level severity. (Id.) Dr. Alex further testified that Plaintiff "urgently needs to lose weight" and that the weight was contributing to his pain. (Id. at 63.) With his impairments, Plaintiff should never climb ladders or scaffolds and should avoid vibration, extreme heat and cold, high humidity, and fumes and similar airborne irritants. (Id. at 64.) Plaintiff can perform a full range of sedentary work. (Id. at 64-65.) A

Global Assessment of Functioning (GAF) score of 50 to 55[2] for Plaintiff would not change Dr. Alex' opinion. (Id. at 66.) Plaintiff's depression appeared to be a reaction to his pain and other problems and not organic. (Id. at 66-67.) Dr. Alex again emphasized how important it is for Plaintiff to lose weight. (Id. at 67-68.)

Mr. Israel was asked by the ALJ to assume a hypothetical claimant of Plaintiff's age, education, and past work experience who can lift twenty pounds occasionally and ten pounds frequently; can sit, stand, and walk each for approximately six hours in an eight-hour work day; should never climb ladders, ropes, and scaffolds; should never kneel; can only occasionally stoop or crouch; and should avoid concentrated exposure to extreme cold and heat, high humidity, and vibrations of the body. (Id. at 69-70.) Asked if this claimant can perform Plaintiff's past relevant work, Mr. Israel replied he cannot. (Id. at 70.) With his limitations and two years of college, he can perform work as a data entry clerk, cashier, order clerk, and packer. (Id. at 71-72.) If he is limited to unskilled work, he can perform work as a sorter, packer, product inspector, checker, and examiner. (Id. at 73.)

---

[2]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. (emphasis omitted).

If the hypothetical claimant is limited to lifting no more than ten pounds occasionally and fewer pounds frequently, he can, based on Plaintiff's college education, perform work in the semi-skilled range.  (Id. at 73-74.)  This includes jobs as a telephone solicitor and telephone-oriented customer service and sales.  (Id. at 74.)  These jobs will remain if he is limited to unskilled entry level work.  (Id.)

If the hypothetical claimant is limited by depression to routine, repetitive, unskilled work that does not require him to master or apply complex or detailed instructions, that is low stress, and that does not require critical interaction with co-workers or the public, some jobs will be eliminated but not jobs in data entry or clerical or interactive customer service.  (Id. at 74-75.)  If, however, the claimant can not push, pull, or reach with his dominate right arm, there are no sustainable jobs.  (Id. at 77.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from health care providers, and assessments of his physical functional capacities.

When applying for DIB and SSI,[3] Plaintiff completed a Disability Report, listing May 1, 2008, as the date he stopped working because of his impairments.  (Id. at 205.)

---

[3]The record indicates Plaintiff had applied before for DIB and SSI, but had not pursued either application after their initial denial in March 2010.

Plaintiff also completed a Function Report.[4]  (Id. at 219-25.)  Asked to describe what he does during the day, he reported he gets his children ready for school, soaks in a tub, and tries to do household chores.  (Id. at 219.)  His back constantly aches.  (Id. at 220.)  He cannot bend over to put on his pants or raise his arm to shave.  (Id.)  His female friend cooks for him.  (Id. at 221.)  His impairments adversely affect his abilities to lift, bend, reach, walk, kneel, and climb stairs.  (Id. at 224.)  They do not adversely affect his abilities to squat, stand, sit, remember, complete tasks, concentrate, use his hands, understand, or follow instructions.  (Id.)  He cannot walk farther than ten steps before having to stop and rest.  (Id.)  He handles stress and changes in routine very well.  (Id. at 225.)  He uses a cane.  (Id.)

The relevant medical records before the ALJ are summarized below in chronological order, beginning with a May 2008 visit to the urgent care providers at St. Louis ConnectCare for a routine physical examination.  (Id. at 261-65.)  Plaintiff had no current physical complaints.  (Id. at 262.)  He reported having had asthma as a child, but not as an adult.  (Id.)  He did not have depression.  (Id.)  The examination was "[u]nremarkable."  (Id. at 263.)

The next record is of Plaintiff's June 2009 visit to the DePaul Health Center (DePaul) emergency room for complaints of mild neck and back pain and headaches following a car accident the previous month.  (Id. at 293-305.)  On a scale of one to ten, he rated his back pain as an eight.  (Id. at 300.)  Plaintiff explained that he wanted to be checked out since his son was being seen there for an injury.  (Id. at 298.)  He denied experiencing knee or shoulder pain.  (Id. at 297.)  He had a history of pulmonary disease, including asthma.  (Id.)

---

[4]There are two Function Reports in the Record.  The Court will cite only to the later one.

On examination, he had midline tenderness in his lower back, but normal deep tendon reflexes and negative straight leg raises.  (Id. at 299, 303.)  He also had tenderness in the midline of his neck, primarily at C-7.  (Id.)  He had a normal affect.  (Id.)  X-rays of his lumbar spine revealed mild endplate degenerative changes from L2 through L4, but no acute osseous abnormality.  (Id. at 294.)  X-rays of his cervical spine revealed endplate degenerative changes at C5, C5, and C7, but no acute osseous abnormality.  (Id. at 295.)  The diagnosis was cervical and lumbar strain.  (Id. at 299, 303.)  He was discharged in stable condition and with instructions to rest, periodically apply ice packs, perform gentle range of motion exercises, see his physician in seven days, and return to the emergency room if his pain increased.  (Id. at 299, 304.)  Also, he was given a prescription for Flexeril, ibuprofen, and Ultram.  (Id. at 299-300, 303-04.)

In July, Plaintiff consulted Katherine A. Burns, M.D., for complaints of left knee pain and right shoulder pain and instability.  (Id. at 432-36.)  Plaintiff explained that he had a long history of problems with his right shoulder beginning with a football injury he sustained when a youth.  (Id. at 433.)  Often, he had "achy discomfort especially with repetitive activity."  (Id.)  He had recently stopped working and thought that the shoulder pain and discomfort would prevent him from returning to the heavy work he had formerly done.  (Id.)  His left knee pain was worse with activity and better with rest.  (Id.)  It was aggravated by repetitive squatting and bending.  (Id.)  His medications included ibuprofen and Vicodin.  (Id.)  On examination, he was "a healthy appearing male in no distress," was alert and oriented, and had a normal mood, affect, and gait.  (Id.)  His left knee was not swollen, but

he had mild discomfort with grind.  (Id.)  His range of motion was 0 to 130 degrees, the same as in his right knee.  (Id. at 433-34.)  His right knee had a lesser degree of discomfort with grind.  (Id. at 434.)  His shoulders were symmetric in appearance and were grossly stable.  (Id.)  The right shoulder had some deep anterior tenderness.  (Id.)  The range of motion and motor strength in each shoulder were the same.  (Id.)  He had some pain in the right shoulder with Hawkin's maneuver.  (Id.)  X-rays of the right shoulder revealed a deformity of the humeral head and a Type II acromion.  (Id. at 434, 436.)  Dr. Burns' diagnosis was symptomatic left patellofemoral degenerative joint disease and history of right shoulder dislocation with probable labral tear and some mechanical symptoms.  (Id. at 434.)  She discussed with Plaintiff the need for a magnetic resonance imaging (MRI) of his right shoulder in order to further evaluate the problem.  (Id. at 435.)  He deferred, explaining he did not have insurance.  (Id.)  She recommended he take ibuprofen as needed for his knee and use heat or a knee sleeve.  (Id.)

In August, Plaintiff was seen at the Forest Park Hospital emergency room for neck and lower back pain caused by a motor vehicle accident.  (Id. at 308-21.)  He had a steady gait.  (Id. at 315.)  On examination, he had tenderness and spasms in his lower back and spasms in his neck.  (Id. at 310.)  He had a full range of motion in both.  (Id.)  X-rays of his neck revealed mild osteoarthritis, but no fracture.  (Id. at 319.)  X-rays of his lumbar spine revealed mild osteoarthritis at T12 and L1, but no fracture.  (Id. at 320.)  He was diagnosed with neck and lower back strain and discharged with prescriptions for Flexeril, Tylenol, and

ibuprofen.  (Id. at 311.)  He was also prescribed Albuterol for his asthma.  (Id. at 318.)  He was instructed to follow-up with his primary care physician.  (Id. at 311.)

In December, Plaintiff returned to the emergency room at Forest Park Hospital with complaints of neck, lower back, right knee, and right shoulder pain since being in a motor vehicle accident one month earlier.[5]  (Id. at 322-33.)  X-rays of his cervical spine revealed mild osteoarthritis at C5 and C6, but no fracture.  (Id. at 331.)  X-rays of his right shoulder were negative.  (Id. at 332.)  Plaintiff was discharged with a prescription for naproxen, a nonsteroidal anti-inflammatory, to be taken as needed and with instructions to follow up with his physician in three to four days.  (Id. at 333.)

In March 2010, Plaintiff returned to the DePaul emergency room for complaints of right shoulder and lower back pain for approximately two years.  (Id. at 366-70.)  He believed the pain was related to his work, which required a lot of lifting.  (Id. at 366.)  He had back and right shoulder pain on examination.  (Id.)  He also had a normal range of motion in his neck, but had pain with a full range of motion in his right shoulder and mild pain with a full range of motion in his back.  (Id. at 367.)  Straight leg raises were negative.  (Id.)  His gait and reflexes were normal.  (Id.)  He was alert and oriented, and in no acute distress.  (Id.)  No x-rays were taken.  (Id. at 368.)  Plaintiff was diagnosed with right shoulder and lower back pain and was discharged with prescriptions for ibuprofen and Flexeril.  (Id. at 368-69, 370.)

_____

[5]The medical records also refer to the accident having occurred two months earlier.  See e.g. Id. at 330.

Plaintiff was seen again at the DePaul emergency room in June for complaints of chronic right shoulder pain, nonradiating low back pain, and left knee pain. (Id. at 389-96.) He reported his pain was worse after mowing a couple of days ago. (Id. at 389.) The provider, Andrew Wahle, P.A., noted that he had seen Plaintiff in March and Plaintiff had not followed-up. (Id. at 389-90.) On examination, Plaintiff had mild, generalized tenderness in his right shoulder and pain with a full range of motion. (Id. at 391.) He had a tender left knee and pain with a full range of motion in that knee. (Id.) Straight leg raises were negative bilaterally. (Id.) He had a normal gait. (Id.) Plaintiff was diagnosed with right shoulder, low back, and left knee pain and discharged with prescriptions for ibuprofen, Flexeril, and Vicodin. (Id. at 391-92.) He was encouraged to establish a relationship with a primary care physician. (Id. at 391.)

In December, Plaintiff consulted Robert P. Poetz, D.O., for an evaluation of his shoulder, knee, and low back pain for the past seven to eight years. (Id. at 438-40.) Dr. Poetz diagnosed Plaintiff with osteoarthritis in the low back and knees and prescribed tramadol and Motrin (ibuprofen). (Id. at 438.) He was to review the emergency room x-rays of Plaintiff's low back and knees. (Id.) He spoke with Plaintiff about a low fat diet and exercise. (Id. at 439.) (Id.)

In February 2011, Plaintiff went to the Hopewell Center for a psychiatric evaluation. (Id. at 442-51.) On examination, Plaintiff was well groomed and had a cooperative attitude, appropriate affect, depressed mood, and normal speech. (Id. at 444.) The evaluator[6] checked

_____

[6] The signature is illegible.

the lines for depression, appetite, hopelessness, sadness, recent memory, and sleep. (Id. at 445.) It was noted that Plaintiff had "some" suicidal thoughts or plans and "some anger," although the line by angry and resentful was not checked. (Id.) His anxiety conditions included only panic. (Id.) His thought process was intact; he did not have any hallucinations or delusions. (Id. at 446.) He was oriented to person, time, and place. (Id.) He was diagnosed with major depressive disorder and assessed as having a GAF of 50 to 55. (Id.) He was prescribed Cymbalta and Ambien. (Id. at 447.)

Plaintiff returned to Dr. Poetz on March 7 for his ongoing knee and back pain. (Id. at 449-50.) X-rays of Plaintiff's knees revealed mild medial femoral tibial joint space narrowing bilaterally and mild patellofemoral joint space narrowing bilaterally. (Id. at 451.) There was no acute fracture or subluxation. (Id.) Dr. Poetz diagnosed mild osteoarthritis and prescribed Arthotec. (Id. at 449, 451.)

Also before the ALJ were assessments of Plaintiff's physical residual functional capacity.

In March 2010, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Jamie Atkinson, a single decision maker.[7] (Id. at 81-87.) The primary diagnosis was osteoarthritis of the lumbar and cervical spines; a secondary diagnosis was asthma. (Id. at 81.) These impairments resulted in exertional limitations of Plaintiff

---

[7]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and sit, stand, or walk for approximately six hours in an eight-hour workday. (Id. at 82.) His ability to push and pull was otherwise unlimited. (Id.) He had postural limitations of only occasionally kneeling, crouching, crawling, and climbing ladders, ropes, and scaffolds. (Id. at 83.) He had no manipulative, visual, or communicative limitations. (Id. at 83-84.) He had environmental limitations of needing to avoid concentrated exposure to vibration, fumes, odors, dusts, and other airborne irritants. (Id. at 84.)

In July 2010, Matt Peterson, a single decisionmaker, also completed a PRFCA of Plaintiff. (Id. at 88-93.) In addition to the impairments listed by Ms. Atkinson, Mr. Peterson included right shoulder pain as a secondary diagnosis. (Id. at 88.) The only other difference in his assessment was the omission of a need to avoid concentrated exposure to fumes, odors, dusts, and other airborne irritants. (Id. at 89-91.)

### The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through March 31, 2013, and has not engaged in substantial gainful activity since his alleged onset date of April 14, 2009. (Id. at 12.) The ALJ next found that Plaintiff has severe impairments of obesity, asthma, and pain in multiple joints. (Id.) Plaintiff does not, however, have an impairment or combination of impairments that meets or medically equals one of listing-level severity. (Id.)

The ALJ then concluded that Plaintiff has the residual functional capacity (RFC) to perform light work with additional limitations of no climbing of ladders, ropes, or scaffolds;

no kneeling or crawling; only occasionally crouching and stooping; and avoiding temperature extremes, humidity, fumes, dusts, gases, and vibrations of the body. (<u>Id.</u> at 13.) In making this determination, the ALJ evaluated Plaintiff's credibility, summarizing the hearing testimony and the medical records. (<u>Id.</u> at 13-18.) He found that the medical records did not support the limitations of joint pain described by Plaintiff. (<u>Id.</u> at 16.) He noted that Plaintiff had reported to Dr. Burns that he could not return to his former heavy work, but this inability did not preclude work performed at lower exertional levels. (<u>Id.</u>) He further noted that Dr. Burns had recommended only ibuprofen for relief of Plaintiff's joint pain and that such over-the-counter analgesic did not support a finding of disability. (<u>Id.</u>) The ALJ considered Plaintiff's obesity, but concluded that the associated limitations were not greater than those incorporated in his RFC findings. (<u>Id.</u>) Plaintiff had sought treatment for depression only once and had never complained to other health care providers of any mental health concerns. (<u>Id.</u>) The ALJ next noted that Plaintiff stated in his function report that he took care of four minor children and drove by himself. (<u>Id.</u> at 17.) Another consideration detracting from Plaintiff's credibility was his poor work record, reflecting low and sporadic earnings. (<u>Id.</u>) Plaintiff had earned over $10,000 in only one year since he was eighteen years old. (<u>Id.</u>)

With his RFC, however, Plaintiff was unable to perform his past relevant work. (<u>Id.</u>) With his RFC, age, education, and work experience, he could perform the jobs described by the VE. (<u>Id.</u> at 17-18.) Consequently, he is not disabled within the meaning of the Act. (<u>Id.</u> at 18.)

## Additional Records before the Appeals Council

Plaintiff submitted additional medical records to the Appeals Council in support of his request for review. These records are from Dr. Poetz or the Hopewell Center.[8]

The records of Dr. Poetz begin with those of an October 2011 visit for complaints of left knee pain and lower back pain for the past fifteen years and right shoulder pain for the past ten years. (Id. at 498.) He had hypertension. (Id.) Plaintiff saw Dr. Poetz again in January 2012. (Id. at 495-97.) He had a normal gait and a full range of motion in all his joints. (Id. at 496.) His judgment and insight were intact; his memory recall was good; he had no mood swings. (Id.) He was diagnosed with Type II diabetes, uncomplicated; unspecified essential hypertension; morbid obesity; and hyperlipidemia. (Id. at 497.) Dr. Poetz noted that Plaintiff had stopped taking all his medications. (Id.) He counseled Plaintiff about weight management. (Id. at 496.) Dr. Poetz' examination findings, including those of Plaintiff's psychiatric symptoms, were the same the following month. (Id. at 491-94.) Added to the diagnoses was bipolar disorder unspecified; morbid obesity and hyperlipidemia were not listed. (Id. at 493.) Plaintiff weighed one pound less, 288 pounds, than at the previous visit. (Id. at 491, 495.) Plaintiff returned for a follow-up visit in May. (Id. at 487-90.) The physical examination was within normal limits. (Id. at 487-88.)

The Hopewell Center records begin with those of an October 2010 intake assessment by Marie Dixon, M.S.W., C.M. (Id. at 478-81.) Plaintiff's chief complaint was of stress, the

---

[8]Plaintiff also submitted x-ray reports from DePaul. These records were already before the ALJ. Also, some of the records from Dr. Poetz and the Hopewell Center were before the ALJ. The previously-submitted records will not again be summarized.

symptoms of which included auditory hallucinations, paranoia, severe changes in mood, talking too much and too fast, quickly changing topics, hypersexuality, irritability, inability to sleep, fatigue, low self-esteem and energy, social conflicts, feelings of hopelessness and worthlessness, poor judgment, and severe anxiety and fearfulness. (<u>Id.</u> at 478.) Plaintiff reported he had been experiencing these symptoms for the past one and one-half years. (<u>Id.</u>) Plaintiff also reported having graduated from high school and completing one year of college. (<u>Id.</u> at 479.) He "denied any problems that would hinder [him] from working . . . ." (<u>Id.</u>) He was not taking any medications and his only chronic physical illness was asthma. (<u>Id.</u>) His recreational activities included walking, barbequing, and watching movies. (<u>Id.</u>) Plaintiff had a history of substance abuse, including both illegal drugs and alcohol, but had not abused either for five years. (<u>Id.</u> at 480.) On examination , Plaintiff was dressed appropriately, had proper hygiene, had intact memory and a fund of knowledge, and was oriented to person, time, place, and situation. (<u>Id.</u>) His thought process included racing and circumstantial thoughts of limited content. (<u>Id.</u>) He reported having auditory hallucinations. (<u>Id.</u>) His speech was average in quality, quantity, rate, and volume. (<u>Id.</u>) His insight and judgment were poor. (<u>Id.</u> at 481.) Plaintiff was diagnosed with bipolar I disorder, most recent episode depressed, severe with psychotic features. (<u>Id.</u>) His current GAF and his GAF for the past year were both 60. (<u>Id.</u>)

The next records from the Hopewell Center are of Plaintiff's psychiatric evaluation in February 2011, see pages 11 to 12, supra, and outpatient progress notes of the same day. Those notes include Plaintiff's report that he can no longer work because of his back

problems.  (Id. at 471.)  The provider, James A. Owens, M.S.W., informed Plaintiff that he needed to see a medical doctor and have that doctor diagnose him.  (Id.)  Plaintiff was under stress due to financial problems and the lack of income.  (Id.)  He was described as having a very poor general appearance, incoherent speech, a sad affect and mood, and illogical thought content.  (Id.)  He did not have any hallucinations, delusions, or suicidal or homicidal ideation. (Id.)  His memory was slowed.  (Id.)  He was prescribed Cymbalta and Ambient and was to return the next month.  (Id.)

In March, Plaintiff reported he had had been depressed, had recently been granted custody of his four children, and was having problems sleeping at night.  (Id. at 470.)  He had migraines and back problems.  (Id.)  He was having auditory hallucinations at night.  (Id.)  On examination, his speech was coherent, his mood was anxious, his affect was dysphoric, his thought process was logical, and his insight and judgment were fair.  (Id.)  He had suicidal ideation and paranoid ideas.  (Id.)  His medications included Seroquel, Depakote, and Cymbalta.  (Id.)

In April, Neurotin was added to his medications.  (Id. at 469.)  He was not having any suicidal ideation or paranoid ideas, but was still not sleeping well and was having headaches.  (Id.)  The dosage of Seroquel was increased at the May session.  (Id. at 468.)  He was getting more sleep, but was still depressed.  (Id.)  In June, Plaintiff reported that his auditory hallucinations were occurring less frequently and were occasionally barely audible.  (Id. at 466.)  Plaintiff reported at his next visit, in August, that was he doing okay; his children were back in school.  (Id. at 465.)  He had been sleeping well and feeling good.  (Id.)  He stayed

in a lot and did "a lot of work around the house." (<u>Id.</u>) He could not return to work because of his back problems. (<u>Id.</u>) He had decided to take his medications as prescribed. (<u>Id.</u> at 464.) As in the past three visits, he did not have any suicidal ideation. (<u>Id.</u>)

In October, Plaintiff reported he "still" had thoughts of suicide every other day. (<u>Id.</u> at 463.) His sleep was better, but he was still staying up all night. (<u>Id.</u>) Topamax was added to his medications. (<u>Id.</u>)

Plaintiff returned to the Hopewell Center in January 2012. (<u>Id.</u> at 460-62.) Plaintiff reported to Mr. Owens he had "been feeling just great," was less angry, and was sleeping well. (<u>Id.</u> at 460.) He was not having any headaches. (<u>Id.</u>) He was speaking to his neighbors and enjoying walking in the neighborhood. (<u>Id.</u>) He had a cooperative attitude, good insight and judgment, a normal mood and affect, coherent speech, and logical thought content. (<u>Id.</u>) He did not have any hallucinations. (<u>Id.</u>) He reported to Matthew Linquist, P.M.H.R.N., that his mood was "off and on" and he was sleeping "a little bit." (<u>Id.</u> at 461.) He had a neat appearance, cooperative attitude, coherent speech, intact thought process, fair concentration, good memory, depressed mood, and constricted affect. (<u>Id.</u>) He also had auditory hallucinations. (<u>Id.</u>) In March, Plaintiff reported he was doing "pretty good," except he felt his diabetes was out of control and his sleep was still erratic. (<u>Id.</u> at 458-59.) His mental status examination findings were as before except his concentration was good and his mood and affect were appropriate. (<u>Id.</u>) In May, Plaintiff reported that he was "'not doing so good,'" but also stated that "'everything is all right.'" (<u>Id.</u> at 456-57.) He had suicidal

thoughts every other day and was "kind of angry lately."  (<u>Id.</u> at 456.)  His mental status examination findings were as before except his affect was constricted.  (<u>Id.</u>)

Also in May, Mr. Linquist completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) for Plaintiff.  (<u>Id.</u> at 482-84.)  He assessed Plaintiff as having a poor or no ability in three of the eight activities listed for the area of making occupational adjustments, a fair ability in three, and an ability worse than fair but better than poor in the remaining two.  (<u>Id.</u> at 482.)  Mr. Linquist explained that Plaintiff has "mental health concerns," including hallucinations and irritability that increase when he is under stress.  (<u>Id.</u> at 483.)  Also, his anxiety levels increase when he is around people too frequently. (<u>Id.</u>)  In the area of making performance adjustments, Plaintiff has, for the same reasons, a fair ability in one of the three activities, and an ability less than good but better than fair in the remaining two.  (<u>Id.</u>)  In the area of making personal-social adjustments, Plaintiff has a poor or no ability in one of the four activities and a fair ability in the remaining three.  (<u>Id.</u> at 484.)

## <u>Standards of Review</u>

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).

Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting <u>Cuthrell v. Astrue</u>, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits.

**Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the

inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues that the (1) ALJ erred (a) in determining his RFC and (b) in assessing his credibility and (2) the Commissioner erred in failing to sufficiently consider the submitted new and material evidence.

As noted above, when assessing a claimant's RFC, the ALJ must evaluate his credibility. See **Wagner**, 499 F.3d at 851; **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005). Thus, before addressing Plaintiff's RFC argument, the Court will address his challenges to the ALJ's adverse credibility determination.

The ALJ evaluated Plaintiff's credibility by considering the factors outlined in 20 C.F.R. §§ 404.1529 and 416.929 – the same factors as outlined in *Polaski*. See **McDade v. Astrue**, 720 F.3d 994, 998 (8th Cir. 2013); **Johnson v. Astrue**, 628 F.3d 991, 995 (8th Cir. 2011); **Blakeman v. Astrue**, 509 F.3d 878, 884 (8th Cir. 2007).

Plaintiff argues that ALJ perfunctorily determined that his statements were not entirely credible and fatally failed to account for "certain specific and credible testimony." (Pl.'s Br. at 21, ECF No. 21.)

An ALJ is required to consider the *Polaski* factors, but is "not required to discuss each [one's] weight in the credibility calculus." **Myers v. Colvin**, 721 F.3d 521, 527 (8th Cir. 2013). See also **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (holding that ALJ need not explicitly discuss *each Polaski* factor). When discounting Plaintiff's credibility, the ALJ explicitly discussed several *Polaski* factors, including the lack of supporting objective medical evidence. See **Curran-Kicksey v. Barnhart**, 315 F.3d 964, 968 (8th Cir. 2003) (approving the consideration of such a lack when evaluating the claimant's credibility).

Plaintiff argues that there is objective evidence to support his complaints of both mental and physical disability. There is not. The first medical record after Plaintiff's alleged disability onset date in April 2009 is of emergency room treatment sought in June 2009 for injuries sustained in a car accident the month before. The next month, he consulted Dr. Burns for complaints of pain, but was described as being in no distress and as alert, oriented, and with a normal mood and affect. He did not complain of any psychological symptoms. His

first complaint of such[9] was made nineteen months after he applied for DIB and SSI.[10]  That was the only evidence before the ALJ of any treatment sought by Plaintiff for mental impairments.  Indeed, in the records of his treatment for physical impairments, there is no reference to any concerns of Plaintiff with his mental health.

The records cited by Plaintiff in support of his argument that the ALJ ignored objective evidence of more restrictive physical limitations are unavailing.  For instance, he cites June 2009 x-rays showing degenerative changes in his lumbar spine and examination findings of tenderness in his lower back.  The x-rays revealed *mild* endplate degenerative changes.  Straight leg raises were negative, indicating the lack of physical findings to verify Plaintiff's reports of back pain.[11]  See **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009).  Plaintiff also cites August 2009 x-rays revealing osteoarthritis of the neck and low back.  The osteoarthritis was described as being mild.  And, at this same visit, he had a steady gait and a full range of motion in his low back and neck.

Another factor properly considered by the ALJ was Plaintiff's poor work record.  In only one of the seventeen years of reportable earnings between 1996 and 2008, inclusive, did Plaintiff earn more than $10,000 annually.  (R. at 177.)  That year was 2005.  (Id.)  He had no earnings in the year in which he alleged he became disabled, 2009, and only $1,206.31 the

---

[9]The Court notes that an October 2010 intake assessment was submitted to the Appeals Council, but was not before the ALJ.  Plaintiff cites *his reports* of hallucinations in that assessment in support of his RFC argument.  The evidence before the Appeals Council is addressed below.

[10]The Court notes that Plaintiff did not cite any mental impairment in his applications.

[11]The Court notes that Plaintiff's straight leg raises were always negative.

year before.  (Id.)  See **Jusczyk v. Astrue**, 542 F.3d 626, 632 (8th Cir. 2008) (finding that ALJ's adverse credibility determination was "well-supported" by, among other things, claimant's earnings at a level below substantial gainful activity); **Frederickson v. Barnhart**, 359 F.3d 972, 976 (8th Cir. 2004) (claimant's "sporadic work record reflecting relatively low earnings and multiple years with no reported earnings" supported adverse credibility determination); **Ramirez v. Barnhart**, 292 F.3d 576, 581 (8th Cir. 2002) ("In making the credibility determination, the ALJ weighed heavily Claimant's poor prior work record and the fact that her prospective SSI benefits would exceed the amount she was able to earn while working . . . .").

The ALJ also cited the use only of over-the-counter pain medication as detracting from Plaintiff's description of disabling pain.  "A lack of strong pain medication is inconsistent with subjective complaints of disabling pain."  **Haynes v. Shalala**, 26 F.3d 812, 814 (8th Cir. 1994).  See also **Rankin v. Apfel**, 195 F.3d 427, 429 (8th Cir. 1999) (finding that infrequent use of prescription medication supported conclusion that subjective complaints were not credible).  And, a failure to seek medical treatment for an allegedly disabling impairment may be inconsistent with disability.  **Shannon v. Chater**, 54 F.3d 484, 486 (8th Cir. 1995).  The records before the ALJ included only one effort by Plaintiff to seek mental health treatment, one visit each to two individual health care providers, and emergency room visits.  A conservative course of treatment sought for debilitating conditions may detract from a claimant's credibility.  See **Black v. Apfel**, 143 F.3d 383, 386 (8th Cir. 1998).  See also **Renstrom v. Astrue**, 680 F.3d 1057, 1066 (8th Cir. 2012) (holding that the ALJ properly

noted when assessing claimant's credibility that the severity of his impairments was not consistent with the medical evidence and course of treatment); **Spradling v. Chater**, 126 F.3d 1072, 1075 (8th Cir. 1997) (finding that claimant's failure to seek more aggressive treatment for complaints of disabling pain detracted from credibility).

The ALJ also considered Plaintiff's daily activities when evaluating his credibility. When testifying at the hearing, Plaintiff reported he could not cut the grass, wash dishes, bend over, vacuum, or sweep. He could not stand for longer than three minutes. He also, however, goes out to eat and dancing with a friend once a month. Even if the ALJ overstated Plaintiff's activities, he was not obligated to accept his description given the other support in the record for his adverse credibility determination.[12] See **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008) (finding that any overstatement by the ALJ of the claimant's daily activities did not require reversal given the other, substantial support in the record for his credibility findings).

Just as the omitted limitations from the ALJ's RFC findings depend on Plaintiff's descriptions of his symptoms being found to be credible, so too does Plaintiff's argument that the ALJ erred by not including a limitation found by Dr. Alex. The ALJ found that Plaintiff had the RFC to perform light work with additional restrictions. Dr. Alex testified that light lifting restrictions would be "pessimistic" "[w]ith the complaints that [Plaintiff] has made."

---

[12]Additionally, "[a]n ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole." **Van Vickle v. Astrue**, 539 F.3d 825, 828 (8th Cir. 2008). There are such inconsistencies in the record before the ALJ, including, as noted by the Commissioner, changes in Plaintiff's reports of the origin and duration of his pain.

(R. at 64.)  It is, however, for the ALJ to determine the credibility of Plaintiff's testimony.

See  **Casey v. Astrue**, 503 F.3d 687, 696 (8th Cir. 2007).

Plaintiff further argues that the ALJ erred by not providing a narrative discussion of

his RFC findings, as required by Social Security Ruling 96-8p.  "[S.S.R. 96-8p] cautions that

a failure to make [a] function-by-function assessment [of a claimant's RFC] could 'result in

the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v.**

**Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting S.S.R. 96-8p, 1996 WL 374184, *1).

An ALJ does not, however, fail in his duty to assess a claimant's RFC merely because the ALJ

does not address all areas regardless of whether a limitation is found.  See **Id.**  Instead, an

ALJ who specifically addresses the areas in which he found a limitation but is silent as to

those areas in which no limitation is found is believed to have implicitly found no limitation

in the latter.  **Id.** at 567-68.  Additionally, an "ALJ need not provide a narrative discussion

immediately following each statement of an individual limitation in the RFC, if the court can

otherwise discern the elements of the ALJ's decision-making."  **Jones v. Astrue**, 2011 WL

4445825, *10 (E.D. Mo. Sept. 26, 2011) (citing Depover, 349 F.3d at 567).  See also **Hilgart**

**v. Colvin**, 2013 WL 2250877, *4 (W.D. Mo. May 22, 2013) (finding that a requirement that

an ALJ "follow each RFC limitation with a list of specific evidence on which the ALJ relied"

to be inconsistent with the court's duty to base its decision on "all the relevant evidence")

(internal quotations omitted).

In his arguments addressing the ALJ's RFC findings and credibility determination,

Plaintiff primarily cites evidence submitted only to the Appeals Council.  He argues "[t]he

Commissioner did not sufficiently account for such evidence when determining [his] limitations."  (Pl.'s Br. at 19.)

"An application for disability benefits remains in effect only until the issuance of a 'hearing decision' on that application."  **Myers**, 721 F.3d at 526 (citing 20 C.F.R. §§ 404.620(a), 416.330).  New evidence submitted to the Appeals Council is considered only to the extent it "relates to the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b).  When that decision is challenged in a § 405(g) action, the Court determines whether it is "supported by substantial evidence on the record as a whole, including the new evidence." **Davidson v. Astrue**, 501 F.3d 987, 990 (8th Cir. 2007). "'To be new, evidence must be more than merely cumulative of other evidence in the record.'" **Perks v. Astrue**, 687 F.3d 1086, 1093 (8th Cir. 2012) (quoting Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000)).  And, although "[t]he Appeals Council's failure to consider [new, material] evidence may be the basis for a remand," **Whitney v. Astrue**, 668 F.3d 1004, 1006 (8th Cir. 2012), the Appeals Council "is not expressly required by the regulations to state its rationale for denying review," **Riggins v. Apfel**, 76 F.Supp.2d 707, 709 (W.D. Mo. 1999).

In the instant case, the Appeals Council stated that it had considered new evidence and identified that evidence by source and dates.  Cf. **Lamp v. Astrue**, 531 F.3d 629, 632-33 (8th Cir. 2008) (remanding case in which it could not be discerned whether the Appeals Council considered only one letter in a particular exhibit or two).  The question then is whether after considering the new evidence relating to the period before May 17, 2011, there is substantial

evidence on the record as a whole to support the ALJ's decision. For the following reasons, there is.

The additional records of Dr. Poetz show a normal gait and full range of movement in his joints. As in earlier-submitted medical records, Plaintiff indicated that he had had left knee and lower back pain for fifteen years and right shoulder pain for the past ten years – all before his alleged disability onset date. The additional records of Hopewell Center begin with a visit at which Plaintiff was reported to have a sad mood and affect, followed by a visit at which he had an anxious mood and dysphoric affect. The following six visits describe a gradual lessening of Plaintiff's psychiatric complaints, including one in August 2011 in which he reported he was feeling good and doing "a lot of work around the house." (R. at 465.) It was at this visit that Plaintiff reported he had decided to take his medications as prescribed.

Plaintiff focuses much of his argument on the Medical Source Statement completed by Mr. Linquist a year after the ALJ's decision. As noted by the Commissioner, however, the assessments in this Statement are inconsistent with the treatment notes, e.g., Plaintiff was described as being seriously limited in his ability to concentrate but the examination findings made the same day were that he had good concentration. See **Davidson**, 578 F.3d at 843 (holding that an ALJ may discount a health care provider's opinion that is inconsistent with the provider's treatment notes). Moreover, as a nurse practitioner, Mr. Linquist is not an "acceptable medical source" under 20 C.F.R. §§ 404.1513(a), 416.913(a), but is an "other source" under 20 C.F.R. §§ 404.1513(d), 416.913(d). **Sloan v. Astrue**, 499 F.3d 883, 888 (8th Cir. 2007). Under Social Security Ruling 06-3p, his opinion may be entitled to weight

insofar as it is consistent with other evidence, is supported by relevant evidence, and is explained.  **Id.** at 889.  Mr. Linquist's opinion is none of these.

### Conclusion

Considering all the evidence in the record, including the evidence before the Appeals Council, the Court finds that there is substantial evidence to support the ALJ's decision.  "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently."  **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010).  Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  20th  day of March, 2014.